UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


PAULA PARDUE for            )
ANTHONY PARDUE              )
                           )
v.                          )        No. 3:03-0139
                           )        Judge Wiseman
JO ANNE B. BARNHART,        )        Magistrate Judge Griffin
Commissioner of Social Security.  )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action, pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration denying the plaintiff's applications for Disability Insurance Benefits ("DIB") as provided by the Social Security Act.

The plaintiff filed an initial application for DIB on April 22, 1999, alleging disability beginning December 1, 1998. (Tr. 70-72). His application was denied initially and upon reconsideration. (Tr. 46-57). Upon the plaintiff's request, a hearing was held on July 19, 2000, at which he was not represented by an attorney. (Tr. 28-45, 58).

On November 27, 2000, the Administrative Law Judge ("ALJ") issued his decision finding the plaintiff not disabled. (Tr. 16-24). This decision became final when the Appeals Council denied review on December 12, 2002. (Tr. 5-6).

Pending before the Court is the plaintiff's motion for judgment on the administrative record (Docket Entry No. 11), and the defendant's motion for judgment on the administrative record (Docket Entry No. 13), to which the plaintiff filed a reply in response (Docket Entry No. 15).

## I.  STATEMENT OF FACTS[1]

The plaintiff was born on March 18, 1962.  (Tr. 70).  The plaintiff stated in his disability report that he completed school through the seventh grade.  (Tr. 88).  The plaintiff repeated fourth grade and was  promoted to fifth grade despite receiving grades of 2 C's, 4 D's, and 1 F.  (Tr. 166).  While in sixth grade, he received 1 D+, 1 D-, and 6 F's.  (Id.)  His school records state that he was "lifted" to the seventh grade.  (Tr. 167).

### Work History

The plaintiff worked as a tow motor driver for Steiner-Liff from 1983 until 1987, when he went to work as a utility system helper for the Water Department of the Metropolitan Government of Nashville and Davidson County.  (Tr. 95).  His work at Steiner-Liff consisted of unloading trucks and bailing material, while his work with the Metro Water Department involved manual labor. (Tr. 31-32).

### Medical History before the ALJ

On October 3, 1992, the plaintiff was admitted to the Vanderbilt University Medical Center Trauma Service due to a gunshot wound to the colon.  (Tr. 168).  The principal procedure performed on the plaintiff while at Vanderbilt was an exploratory laparotomy with colon repair.  (Id.)  The plaintiff was discharged on October 19, 1992.  (Id.)

---

[1]After the ALJ's decision, the plaintiff submitted additional evidence to the Appeals Council. (Tr. 231-374).  However, this Court cannot consider this evidence for purposes of determining whether substantial evidence supports the final decision of the Commissioner because the evidence was not in the record before the ALJ.  Instead, the court may consider the additional evidence only for the purpose of determining whether a remand is appropriate.  See Cotton v. Sullivan, 2 F.3d 692, 696 (6th Cir. 1993).

Case 3:03-cv-00139   Document 18   Filed 08/04/05   Page 2 of 25 PageID #: 2

On April 25, 1996, the plaintiff saw Dr. Stanley G. Hopp. (Tr. 223). During his visit, he stated that he had back pain "off and on." (Id.) The plaintiff related his back problems to an April 6, 1996, on-the-job injury when he stepped off a porch and jarred his back. (Id.) Dr. Hopp diagnosed "lumbar syndrome, degenerative disc disease L3-4, spondylolisthesis L5-S1," and prescribed Darvocet, Robaxin and physical therapy. (Id.) He restricted the plaintiff for three weeks to "no lifting more than 25 pounds, occasional bending, stooping, [and no] twisting." (Id.)

A lumbosacral myelogram performed on May 9, 1996, showed "post operative spine with significant stenosis." (Tr. 222). A CT scan yielded the impression: "mild central bulging of the L3-L4 and L4-L5 disc spaces. Deformity of the right side of the body of L4, above described. Peripheral orientation of the nerve roots is seen in the caudal thecal sac suggesting arachnoiditis." (Tr. 220). On May 16, 1996, Dr. Hopp restricted the plaintiff for one month to no lifting more than 20 pounds, and rare bending and stooping. (Tr. 219). He also prescribed Ultram and Elavil. (Id.)

On March 17, 1997, the plaintiff was evaluated by Dr. Robert Clendenin III. (Tr. 188-89). Dr. Clendenin diagnosed "lumbar spondylolisthesis with arachnoiditis secondary to previous lumbar injury exacerbated by his injury of April 1996." (Tr. 189). Dr. Clenindin opined that there were no good surgical options for the plaintiff, and stated that he did not believe the plaintiff could perform his duties as a utility system helper. (Id.) He recommended "no repetitive bending or working overhead in an outstretched position, with no lifting over 25 pounds," and opined that the plaintiff would be able to perform a job requiring sitting or driving. (Id.)

On January 27, 1998, the plaintiff returned to Dr. Hopp, stating that he was "worse" and "could not stand up straight" although he was still working at Metro Water. (Tr. 217). On June 5, 1998, the plaintiff again visited Dr. Hopp, who noted that the plaintiff had not worked from June 1,

1998, through June 15, 1998. (Tr. 216). Dr. Hopp prescribed Aristocort, Ibuprofen, and Ultram, and noted that the plaintiff was already taking Soma. (Id.)

On July 2, 1998, the plaintiff told Dr. Hopp that his pain was worse, that Aleve did not help him, and that Soma made him drowsy. (Tr. 215). Dr. Hopp ordered him to stop working for seven days. (Id.) A lumbar diskogram that was performed on July 7, 1998, confirmed spondylolisthesis and degenerative disc disease. (Id.) Dr. Hopp restricted the plaintiff from lifting more than 20 pounds, pushing/pulling more than 40 pounds, any bending or stooping, and any repetitive twisting. (Id.)

On December 12, 1998, Dr. Hopp told the plaintiff that he did not think the plaintiff would do well with surgery and that "it would probably be best for him to apply for disability if he doesn't think he can work any longer," and that he would "be glad to support [the plaintiff] in this endeavor." (Tr. 213). In a "Note to Chart" dated January 11, 1999, Dr. Hopp noted:

> I feel that Mr. Pardue has significant back pain coming from his spondylolistheis L5-S1 and degenerative disk disease L3-4 and L5-S1. He also has arachnoiditis with scarring of the nerves. I felt that in light of his severe problems and this pattern of degeneration and chronic nerve damage, that he would more likely than not be unable to perform his regular job duties. I told him I would be glad to support him in any efforts in applying for disability.

(Tr. 212).

On February 10, 1999, Dr. McNamara, of the Bone and Joint Clinic, described the plaintiff as "mildly obese" and found that the plaintiff suffered from spondylolisthesis and arachnoiditis. (Tr. 190). He opined that the plaintiff was "not capable of returning to the manual labor work force," and that his "restrictions would include no lifting greater than the medium level." (Id.)

The plaintiff's last two visits with Dr. Hopp were on July 19, 1999, and January 13, 2000, respectively. (Tr. 205, 230). On July 19, 1999, Dr. Hopp noted that the plaintiff had only 50% of

4

normal lumbar motion and again opined that the plaintiff had "degenerative disk disease lumbar spine and spondylolisthesis." (Id.) On January 13, 2000, Dr. Hopp described the plaintiff as "quite limited as far as bending, lifting 5-10 pounds, sitting not more than 30-45 minutes at a time, standing 30-45 minutes and not more than 3-4 hours a day, walking for 15-20 minutes, and avoid twisting, reaching overhead, climbing, crawling, etc." (Tr. 230).

On July 15, 1999, the plaintiff was admitted to Summit Medical Center for "mental status changes" associated with substance overdose. (Tr. 191-99). He was reported to have taken Soma and four wine coolers (Tr. 191), and it was noted that his wife and sister reported that the plaintiff was "known to take excessive quantities of medication, exceeding the prescribed doses." (Id.) However, the plaintiff "emphatically state[d] that he was not attempting to commit suicide and did not intentionally take an overdose of medication." (Tr. 193).

On September 10, 1999, the plaintiff was seen by Dr. J.P. Keith Nichols, upon referral from Dr. Hopp. (Tr. 209-10). The plaintiff told Dr. Nichols that nothing had significantly altered his pain, and that he had "constant aching" in his lower back. (Tr. 209). Dr. Nichols' impression was "chronic low back pain secondary to degenerative disk disease at the L3-4 and L4-5 and L5-S1 with spondylolisthesis at L5-S1." (Tr. 210). Dr. Nichols opined that the plaintiff's "treatment options are very limited" and recommended a referral to a chronic pain clinic . . . [as] his pain may require the use of long-term narcotics." (Id.)

On September 27, 1999, the plaintiff saw Dr. Steven Kinney at the Hermitage Family Practice Clinic. (Tr. 229). Dr. Kinney recommended that the plaintiff attend a chronic pain clinic, and found that the plaintiff was addicted to prescription drugs. (Id.) Dr. Kinney suggested that the plaintiff use Advil/Tylenol, attend a pain clinic, and see a psychologist or a psychiatrist. (Id.) On

5

April 24, 2000, Dr. Kinney diagnosed the plaintiff as having depression and prescribed Prozac. (Id.)
On June 15, 2000, he assessed the plaintiff as having back strain, depression, hypertension, and adult
onset diabetes mellitus. (Tr. 227). On June 29, 2000, Dr. Kinney diagnosed the plaintiff as having
Hepatitis C. (Tr. 226).

Dr. Kinney submitted a mental assessment to SSA on June 29, 2000. (Tr. 224-25). In the
assessment, Dr. Kinney opined that the plaintiff had "no useful ability to function" in any of the
enumerated areas of work-related mental functioning. (Tr. 225). He noted that "chronic pain,
depression, prescription drug addiction and physical impairments" supported his assessment and that
the plaintiff was "just miserable overall and hopeless." (Id.)

On February 25, 2001, the plaintiff died of a self-inflicted gunshot wound to the head.
(Tr. 241-43). The pathologic diagnoses included fatty cirrhosis of the liver, chronic pancreatitis,
congestive splenomegaly, and slight aortic atherosclerosis. (Tr. 244). The toxicology was positive
for cocaine and cocaine metabolites in the blood. (Tr. 248).

After his death, his widow was substituted as the claimant. (Tr. 326).

Statements and Testimony from the Plaintiff, his Wife and his Sister

During the disability application process, the plaintiff's wife and sister helped him complete
a disability report, an activities of daily living questionnaire, a reconsideration disability report, a
"Statement When Request for Hearing is Filed," and a "Claimant's Recent Medical Treatment"
form. (Tr. 81-90, 112-71, 18, 162-63, 164). In the disability report, dated April 4, 1999, the plaintiff
identified his limiting medical conditions to be back problems and the pain endured as a result of

a gunshot wound. (Tr. 81). In the Activities of Daily Living questionnaire, the plaintiff reported taking "Soma 4 times a day, Mepergan 4 times a day, and Valium 3 times a day." (Tr. 113). The plaintiff described his daily activities outside the home as "go[ing] riding sometimes or to store or movie or family members home for dinner sometime." Although his wife prepared all of the meals, he would occasionally wash the dishes or take out a "small bag" of trash. He identified his hobbies as watching television, and "sometime" going fishing or to a movie. (Tr. 114-15).

In a pain questionnaire dated May 12, 1999, the plaintiff stated that he could not work, do yard work, or participate in any sports. (Tr. 105). On the plaintiff's behalf, his sister, Sherry Raymond, wrote the following:

> Walk little girl about half block to school. Watch T.V. most time. Sometimes go to store. Do not do much socializing unless it's watching boxing or something on T.V. with family members.

(Tr. 105).

At the hearing before the ALJ, when asked how his injuries affected his ability to function, the plaintiff responded that he could not lift anything and that he thought the doctor limited him to "five pounds of lifting." (Tr. 33). The plaintiff described his pain as being in the lower part of his back, extending down the calves of both legs. (Id.) On a scale of 1 to 10, the plaintiff identified his pain level at 9 when he stood up. (Tr. 34). However, on average, he described the pain at "about a five." (Tr. 35). When asked about his daily activities, the plaintiff responded:

> Not too much of nothing; that's what [the doctor] got onto me about. They want me to start walking a little bit trying to — I'm around the house a lot. Maybe sometimes me and my wife will go shopping or to a movie, something like that. That's about it. . . . I've got a 5-year-old and this past summer we had her on a little ball club and I kind of done that all summer long, kind of got to watch her play baseball; and I do go fishing every once in a while.

7

(Tr. 36).

Vocational Expert Testimony

Based on Dr. Hopp's clinic note dated January 13, 2000, the ALJ gave the following hypothetical to the Vocational Expert ("VE"):

> [A] person is described as having a back problem where there's limitation and motion of the lumbar spine described as being about 40 percent normal where lifting is described as five to ten pounds as a maximum weight. Sitting not more than 30, 45 minutes, standing 30 to 45 minutes, not over three to four hours a day, walking 15 to 20 minutes, avoiding twisting, reaching overhead, climbing - - - reaching overhead, climbing, crawling, of course, bending is limited. Now, within the context of the restrictions on the total standing and walking, let's assume for purposes of the questions that we can approach a full 8-hour work day both total.

(Tr. 40).

The VE responded that this hypothetical would limit an individual to some types of sedentary work. (Tr. 40). The VE testified that, while it would preclude all of the plaintiff's past relevant work, it would allow for jobs such a "table worker, waxer, components cleaner, parts coater, and small parts assembler." (Tr. 40-41). He then stated that there would be in excess of 23,000 such jobs in Tennessee. (Id.)

The ALJ then expanded the plaintiff's abilities in a second hypothetical. In that hypothetical, the ALJ asked the VE to:

> . . . hypothesize lifting not more than 20 pounds on occasional basis, ten pound frequently. Let's assume standing and walking two hours a day, sitting for up to six hours a day, actually, we're going to put this standing and walking at up to two to four hours with sitting at six, with a sit, stand option. We want to provide for the opportunity to sit and stand as previously described, and I want the waist motion restrictions; the twisting, bending, and then I want to add some environmental restrictions. I want to restrict climbing, and I want to restrict work to those activities on uneven - - I want to restrict uneven surface exposure.

(Tr. 41).

8

In response, the VE explained that over 14,000 jobs would be available in the light level of work. (Tr. 42). These jobs included being a marker, a gluer, a small product packer, and a central supply attendant. (Id.)

Finally, when asked about the vocational effect of a person whose pain is not completely controlled by medication or by changing position or reducing or restricting exertional activity, so that the pain is at least moderately severe and has a significant affect upon the ability to concentrate and to persist, maintain work pace and maybe even attend work, the VE replied that "if that was an on-going pattern, that would largely preclude any type of full-time, gainful, work assignment." (Tr. 43).

The ALJ's Findings

In his decision, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through at least December 31, 2003.

2. The claimant had not engaged in substantial gainful activity since December 1, 1998, the alleged onset of disability.

3. The claimant's degenerative disc disease, arachnoiditis, and status post lumbar sprain are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b). The claimant's status post abdominal gunshot wound, high blood pressure, diabetes, anxiety not otherwise specified, and history of drug and alcohol abuse have not been shown to impose any significant extended limitations of function during the period at issue but have [been] considered.

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding his limitation and pain and their impact on his ability to perform work-related activities are not totally credible for the reasons set forth in the body of the decision.

9

6. All of the medical opinions in the record regarding the severity of the claimant's impairments have been carefully considered (20 CFR § 404.1527).

7. The claimant retains the residual functional capacity to lift up to 25 pounds maximum and 5 to 10 pound frequently; avoid twisting, reaching overhead, crawling, or climbing; occasional bending and stooping are allowed; and sit, stand, and walk eight hours in an eight-hour workday with normal breaks and an option to sit or stand.

8. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

10. The claimant has a "limited education"(20 CFR § 404.1564).

11. Transferability of skills is not an issue in this case (20 CFR § 404.1568).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there were a significant number of jobs in the national economy that he could perform. As representative examples of such jobs in the State of Tennessee, the vocational expert cited about 14,000 jobs at the light exertional level of marker, gluer, small product packer, and central supply attendant and about 23,000 jobs at the sedentary exertional level of small parts assembler, table worker, waxer, component cleaner, and parts coater. This is a significant number.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(Tr. 23-24).


## II.  DISCUSSION


A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether or not the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion.  42 U.S.C. §§ 405(g) and 1382(c)(3);  Richardson v. Perales, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Gibson v. Secretary of Health, Education & Welfare, 678 F.2d 653 (6th Cir. 1982).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the Court might have decided the case differently based on substantial evidence to the contrary.  Her v. Commissioner of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999).  A reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).  Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.  It is more than a mere scintilla of evidence.  Richardson, supra;  Le Master v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Court must accept the ALJ's explicit findings and determination unless the record, as a whole, is without substantial evidence to support the ALJ's determination.  Houston v. Secretary of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984);  Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).

## B.  Proceedings at the Administrative Level

The Commissioner must employ a five-step evaluation process in determining the issue of disability.  The five steps are as follows: (1) If claimant is doing substantial gainful activity, he is not disabled; (2) If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled; (3) If claimant is not doing substantial gainful activity and

11

is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry; (4) If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled; (5) Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors, such as age, education, and past work experience, he is not disabled.[2]  See 20 C.F.R. § 404.1520.  See also Tyra v. Secretary of Health & Human Servs., 896 F.2d 1024, 1028-29 (6th Cir. 1990); Farris v. Secretary of Health & Human Servs., 773 F.2d 85, 88-89 (6th Cir. 1985); Mowery v. Heckler, 771 F.2d 966, 969-70 (6th Cir. 1985); Houston, supra.

The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques.  Id. See 42 U.S.C. § 1382c(a)(3)(C); 20 C.F.R. §§ 404.1512 (a), (c), 404.1513(d); Landsaw v. Secretary of Health & Human Servs., 803 F.2d 211, 214 (6th Cir. 1986); Tyra, 896 F.2d at 1028-29.  However, the Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment.  42 U.S.C. § 432(d)(2)(C); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy.

_____

[2]This latter factor is considered regardless of whether such work exists in the immediate area in which plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied.  Ragan v. Finch, 435 F.2d 239, 241 (6th Cir. 1970).

Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980); Hephner, supra.  To rebut a *prima facie* case, the Commissioner must come forward with particularized proof of the plaintiff's individual vocational qualifications to perform specific jobs.  O'Banner v. Secretary of Health, Education & Welfare, 587 F.2d 321 (6th Cir. 1978).

Analyzing the evaluation process at step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since December 1, 1998.  (Tr. 23).  At step two, the ALJ determined the evidence established that the plaintiff had degenerative disc disease, arachnoiditis, and that his status post lumbar sprain constituted severe impairments.  (Id.)  At step three, the ALJ found that the medical evidence in the record did not indicate that the plaintiff had any impairments that met the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Id.)  At step four, the ALJ determined that the plaintiff could not perform past relevant work.  (Id.)  At step five, when asked if there were jobs in the national economy that could be performed by an individual with the plaintiff's described residual functional capacity, a Vocational Expert ("VE") identified a significant number of jobs.  (Id.)  Specifically, the VE cited the examples of marker, gluer, small product packer and central supply attendant, all at the light exertional level, and examples of small parts assembler, table worker, waxer, component cleaner, and parts coater, all at the sedentary level.  (Tr. 24).  Therefore, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act, and not entitled to DIB.  (Tr. 24).


C.  The Plaintiff's Assignments of Error

In his in-depth brief, the plaintiff makes seven different arguments:

1.  That the ALJ failed to meet his duty to fully and fairly develop the record.

13

2. That the ALJ's finding that the plaintiff's obesity, depression, anxiety, hepatitis C, hypertension, diabetes, and insomnia were not severe impairments, either individually or in combination, is not supported by substantial evidence.

3. That the ALJ failed to follow applicable rules, regulations and case law regarding the evaluation of the plaintiff's symptoms, including pain.

4. That the ALJ's failure to consider the plaintiff's obesity is a violation of SSR 00-3p.

5. That the ALJ erred in failing to give appropriate weight to the opinion of treating orthopedist Dr. Stanley Hopp.

6. That the ALJ's rejection of Dr. Kinney's mental assessment is contrary to the regulations and not supported by substantial evidence.

7. That the VE's testimony was not substantial evidence, since it was rendered in response to defective hypothetical questions.


1. The ALJ failed to meet his duty to fully and fairly develop the record.

When a claimant seeks Social Security disability benefits, the ALJ, as the fact-finder, has a duty to develop the record fully and fairly. Richardson v. Perales, 402 U.S. at 411; Lashley v. Secretary of Health & Human Servs., 708 F.2d 1048, 1051 (6th Cir. 1983). The purpose behind this requirement is twofold. First, it promotes the goal of providing benefits to deserving claimants. Battles v. Shalala, 36 F.3d 43, 44-45 (8th Cir. 1994). Second, "an adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based." Id. "There is no bright line test for determining when the [administrative law judge] has . . . failed to develop the record. The determination in each case must be made on a case by case basis." Lashley, 708 F.2d at 1052.

14

The plaintiff argues that the ALJ erred by failing to fully and fairly develop the record.[3] He notes his borderline intellectual abilities,[4] history of depression, reliance on pain pills and sedatives, and, most importantly, that he was unrepresented by counsel at the hearing. Specifically, the plaintiff argues that the ALJ failed to obtain his school psychological records, records of his lumbar laminectomy, a number of reports from Dr. Hopp, and the records of Dr. Gaston, who was the plaintiff's primary physician from 1996 to 1999. In addition, the plaintiff contends that the ALJ failed to investigate the nature of his hepatitis C, despite discussing the condition at the hearing (Tr. 29). The plaintiff argues that, had the ALJ collected these records, he could not have accurately asserted that Mr. Pardue had "never sought regular treatment . . . for any mental condition," given Dr. Gaston's many references to treatment for depression, anxiety and insomnia. (Tr. 19, 260, 261, 262, 263, 266, 267, 269, 270, 278, 280).

To support his position, the plaintiff relies in part upon Lashley v. Secretary, 708 F.2d 1048 (6th Cir. 1983). In Lashley, the Court of Appeals for the Sixth Circuit noted that a special,

_____

[3]The Commissioner's brief, unfortunately, does not respond directly to this argument. Rather, the Commissioner argues broadly that the ALJ applied the correct legal standards, and that the decision that plaintiff could perform light work was supported by substantial evidence. While the defendant's argument certainly does not help the Court, it does not equate to, as the plaintiff contends, a concession on the merits.

[4]At the hearing, when asked if he could read and write, the plaintiff responded, "I can read but I can't spell nothing, just my name's about it. . . . Well, I can read the paper at — certain ways, you know, I can make it out, you know. . . . One word I might not know here but then the next word get the meaning out of it." (Tr. 37).

In Skinner v. Secretary of Health and Human Servs., 902 F.2d 447, 449 (6th Cir. 1990), the inability to read more than a simple sign or to write on more than a third grade level was held to be functional illiteracy. In Dixon v. Hickler, 811 F.2d 506 (10th Cir. 1987), the Court found that the plaintiff's inability to write rendered him illiterate. At the very least, these interpretations of the term "illiterate" coupled with the plaintiff's testimony put the ALJ on notice of the possibility that the plaintiff is illiterate. At a minimum, the ALJ should have explored this issue further.

15

heightened duty is imposed on the ALJ when a claimant appears without counsel, and that to satisfy this duty "the administrative law judge must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" Id. (quoting Gold v. Secretary of Health, Education & Welfare, 463 F.2d 38, 43 (2d Cir. 1972)). Specifically, the Court in Lashley paid special attention to the fact that the hearing before the ALJ was only 25 minutes long, that the plaintiff "possessed limited intelligence, was inarticulate, and appeared to be easily confused," and that the ALJ's questions to the plaintiff were superficial and not sufficiently probing. Id. at 1052.

   In this case, the entire hearing lasted 30 minutes, and took up 18 pages of transcript. (Tr. 28-45). Of those 18 pages of transcript, a little over ten pages consisted of questions from the ALJ to the plaintiff. (Tr. 28-39). These ten pages included cursory questions about the plaintiff's lack of education and inability to spell (Tr. 32-33, 37), a brief discussion about the plaintiff's daily activities (Tr. 36-37), and a number of questions regarding the amount of pain the plaintiff endured.

   Like the Court in Lashley, this Court recognizes that the ALJ is "under a duty to dispose promptly of claims and avoid unnecessary delays" and did not intend to produce an unfair result. Lashley, 708 F.2d 1052. Nevertheless, due to the brevity of the hearing, the ALJ's superficial line of questioning, the plaintiff's limited intelligence, and the fact that he was not represented by counsel, the Court finds that the ALJ failed to fulfill his responsibility in this case. Specifically, the ALJ should have inquired further into the plaintiff's limited education, the severity of his hepatitis C, and his history of depression and anxiety. Much of this information, however, is now available in the additional evidence the plaintiff submitted to the Appeals Council. (Tr. 231-374).

2.  The ALJ's finding that the plaintiff's depression, anxiety, hypertension, diabetes, hepatitis C and insomnia, either singly or in combination, were not severe impairments is not supported by substantial evidence.[5]

At step two of the evaluation process, the ALJ must decide whether the plaintiff has an impairment or combination of impairments that are severe.  The Court of Appeals for the Sixth Circuit has construed this second step severity prong as a de minimis hurdle in the disability determination process.  Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988);  Murphy v. Sec'y of H.H.S., 801 F.2d 182, 185 (6th Cir. 1986);  Salmi v. Sec'y of H.H.S., 774 F.2d 685, 690-92 (6th Cir. 1985);  Farris v. Sec'y of H.H.S., 773 F.2d 85, 89-90 (6th Cir. 1985).  Under the prevailing de minimis view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.  Farris, 773 F.2d at 90.

In this case, the ALJ determined that the plaintiff's degenerative disc disease, arachnoiditis, and his status post lumbar sprain were severe impairments.  (Tr. 23).  However, in a record filled with references to the plaintiff's depression, anxiety, hepatitis C, hypertension, diabetes and insomnia, the Court finds that the ALJ erred in finding that these impairments, either individually or in combination, were not severe impairments.  Even a cursory review of the medical evidence in the record reveals that these impairments are not the "totally groundless claims" the non-severity step of the sequential process was designed to address.  Farris, 773 F.2d at 89.

_____

[5]Although the plaintiff also argues that this obesity is severe, this argument is addressed on page 19 of this Report and Recommendation.

17

3.  The ALJ followed the applicable rules, regulations and case law regarding the evaluation of the plaintiff's symptoms, including pain.

Subjective allegations of disabling symptoms, including pain, alone do not support a finding of disability. See Duncan v. Sec'y of Health & Human Servs., 801 F.2d 847, 852 (6th Cir. 1986). To evaluate the claimant's subjective complaints of pain, the Court must examine:

> . . . whether there is objective medical evidence of an underlying medical condition. If there is, [the court] then examine[s]: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Id. at 853.  When objective medical evidence fails to confirm the severity of the claimant's alleged pain, the Commissioner must consider a claimant's credibility.  See Felisky, 35 F.3d 1027, 1039 (6th Cir. 1994).  The credibility of the plaintiff's alleged pain is determined by an examination of (1) his daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) any other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529.

In his decision, the ALJ stated that, "[a]fter carefully considering the entire documentary record and the [plaintiff's] subjective allegations, it is determined that substantial evidence does not support a conclusion that the objectively determined medical conditions are of such severity that they could be expected to give rise to disabling pain and other limitations as alleged by the [plaintiff]."  (Tr. 20).  To support his conclusion, the ALJ then examined (1) the plaintiff's daily

18

activities, (2) the location, duration, frequency, and intensity of the plaintiff's pain, (3) precipitating and aggravating factors such as the plaintiff's history of drug abuse, (4) the medication taken by the plaintiff, and (5) treatment the plaintiff received for relief of his pain. Thus, the ALJ properly followed the relevant criteria as specified in 20 C.F.R. § 404.1529. (Tr. 20-21).

4. The ALJ's failure to consider the plaintiff's obesity does not violate SSR 02-1p (which superseded SSR 00-3p).

The plaintiff next maintains that the ALJ failed to properly consider his alleged obesity. However, this argument must fail for two reasons.

First, the plaintiff failed to indicate that his weight was a disabling condition, as required by 20 C.F.R. § 404.1512(a) ("[w]e will consider only impairment(s) you say you have or about which we receive evidence.") In addition, the plaintiff made no mention of his weight despite an inquiry by the ALJ about "[a]ny other problems." (Tr. 38). Second, the plaintiff had no clinical notes or medical records that consistently showed high body weight or a high Body Mass Index ("BMI"), as required by SSR 02-1p.

5. The ALJ gave the appropriate weight to the opinion of treating orthopedist Dr. Stanley Hopp.

On January 13, 2000, Dr. Stanley Hopp noted that the plaintiff was "quite limited as far as bending, lifting 5-10 lbs, sitting not more than 30-45 minutes at a time, standing 30-45 minutes and not more than 3-4 hours a day, walking 15-20 minutes, avoid twisting, reaching overhead, climbing, crawling, etc." (Tr. 230). The plaintiff argues that Dr. Hopp's opinion was not contradicted and was

19

entitled to complete deference. Specifically, the plaintiff believes the ALJ improperly rejected Dr. Hopp's opinion by finding that the plaintiff could lift up to 25 pounds maximum. However, the plaintiff's argument is without merit.

Dr. Hopp's January 13, 2000, restrictions limited the plaintiff to lifting 5-10 pounds. (Tr. 230). However, he also noted on January 13, 2000, that he believed that the plaintiff's condition was "the same as when [he] had last seen him." Id. On August 19, 1999, the last time of record that Dr. Hopp had seen the plaintiff prior to January 13, 2000, he advised that the plaintiff "continue [with the] same restrictions as before" (Tr. 205), which entailed "[n]o lifting more than 25 pounds maximum, avoid twisting, occasional bending and stooping are allowed" (Tr. 207). Thus, the restrictions given by the ALJ were consistent with Dr. Hopp's restrictions.


6. The ALJ's rejection of Dr. Kinney's medical assessment is contrary to the regulations and not supported by substantial evidence.

On June 29, 2000, Dr. Steven R. Kinney completed a mental assessment form. (Tr. 224-25). Dr. Kinney opined that the plaintiff had no useful ability to function in any of the enumerated areas of work-related mental functioning. Id. In support of this assessment, Dr. Kinney cited the plaintiff's "chronic pain, depression, prescription drug addiction and physical impairments," and noted the plaintiff to be "[j]ust miserable overall and hopeless." (Tr. 225).

The ALJ gave the following rationale for rejecting Dr. Kinney's assessment:

> The assessment of Dr. Kinney (Exhibit 10F) that the [plaintiff] has no useful ability to function at all has no factual basis and cannot credibly be afforded any weight. Dr. Kinney is a family practitioner without any specialized mental health training that would qualify him to make such findings with regard to the [plaintiff's]

20

> mental health.  In fact, this report is totally negated by the [plaintiff's] report that he
> is the sole caretaker of his five-year old daughter while his wife works including
> preparing meals and visiting the park with his child and the family dog, attending his
> daughter's ball games, performing household chores, shopping, going to the movies,
> and driving regularly.  As noted previously, the [plaintiff's] mild decline in
> concentration due to his anxiety not otherwise specified would not significantly
> interfere with his ability to function.

(Tr. 20).

An ALJ is "not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them." Hall v. Bown, 837 F.2d 272, 276 (6ᵗʰ Cir. 1988).  Thus, the question becomes whether the ALJ's rejection of Dr. Kinney's assessment was based on "good reasons"  The Court finds it was not.

The ALJ's assertion that Dr. Kinney's alleged lack of "any specialized mental health training" disqualified him from making "such findings with regard to the [plaintiff's] mental health" is contrary to 20 C.F.R. § 404.1513, which recognizes licensed physicians as "acceptable medical sources."  While regulations provide that SSA will "generally give more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist," 20 C.F.R. § 404.1527(d)(5), the ALJ did not rely on the opinion of a mental health specialist to "trump" the opinion of Dr. Kinney.

Furthermore, in finding that Dr. Kinney's report was "totally negated," the ALJ found that the plaintiff was the "sole caretaker of his five-year old daughter while his wife works including preparing meals and visiting the park with his child and the family dog, attending his daughter's ball

games, performing household chores, shopping, going to the movies, and driving regularly." (Tr. 20). The Court finds that such a categorization of the plaintiff is not supported by the record.

First, the record does not reflect that the plaintiff was the "sole caretaker" of his daughter. In a June 12, 1999, pain questionnaire, Ms. Raymond, the plaintiff's sister, stated that the plaintiff walked his daughter "about half block to school" and "most of the time" just watched T.V. (Tr. 105). The plaintiff testified at the hearing that he watched his daughter play baseball and that he went fishing "every once in a while." (Tr. 36). While the ALJ found that the plaintiff prepared meals, the record indicates that he never cooked and that his wife prepared his meals. (Tr. 114). These activities do not necessarily mean that he was the "sole caretaker" of his daughter while his wife works.

Second, describing the plaintiff as being able to perform household chores, shop, and go to the movies is, at best, an incomplete description of the plaintiff's abilities. When questioned by the ALJ about his daily activities, the plaintiff responded that he does not do "too much of nothing." (Tr. 36). He informed the ALJ that "they want me to start walking a little bit" and that "maybe sometimes me and my wife will go shopping or to a movie, something like that." (Id.) In Ms. Raymond's pain questionnaire, she stated that the plaintiff "can't do yard work or anything around the house." (Tr. 105). Ms. Raymond also explained that a "good day for [the plaintiff] is to bath (sic) and without pain and a car to the store," and that "he don't have many of them." (Tr. 111).[6]

_____

[6]In his brief in support of his motion for judgment on the administrative record, the plaintiff informs the Court that the "Eighth Circuit Court of Appeals forcefully addressed the Commissioner's misplaced reliance on claimants' routine daily activities to deny claims in its decision in Banks v. Massanari, 258 F.3d 820, 832 (8th Cir. 2001)." Docket Entry No. 17, at 35. The plaintiff cites the following:

> How many times must we give instructions that these activities do not indicate that a claimant is able to work full time in our competitive economy? In Baumgarten v.

Case 3:03-cv-00139   Document 18   Filed 08/04/05   Page 22 of 25 PageID #: 22

Third, the ALJ's opinion that the plaintiff drives "regularly" is not supported by the record. While the plaintiff has a driver's license, in an Activities of Daily Living Questionnaire he stated that he drove "sometimes." (Tr. 114). At the hearing, when asked if he drove, the plaintiff responded that he drove and that his wife did as well. (Tr. 37). The Court finds that this information is not sufficient for the ALJ to jump to the conclusion that the plaintiff drove "regularly."

The Court finds, therefore, that the ALJ failed to identify good reasons for rejecting the opinion of Dr. Kinney and that he failed to consider the requirements set forth in 20 C.F.R. § 404.1513.

7. The VE's testimony was not substantial evidence, as it was rendered in response to defective hypothetical questions.

Since the ALJ failed to fully and fairly develop the record and failed to provide proper reasoning to reject the opinion of Dr. Kinney, any testimony given by the VE was rendered in response to defective hypothetical questions.

---

Chater, 75 F.3d 366, 369 (8th Cir.1996), we reiterated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work," (quoting Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir.1995)).

Id. at 832.

While the Court agrees that the ability to perform light housework or visit friends does not negate a finding of disability, it is important to note, as the plaintiff failed to do, that the passage in Banks was written as part of the dissent.

23

8.  The evidence submitted to the Appeals Council is material new evidence under Sentence six of 42 U.S.C. § 405(g) for which the plaintiff has provided good cause for his failure to incorporate into the record before the ALJ

Sentence six of 42 U.S.C. § 405(g) provides that a court "may at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding...."

New evidence is considered "material" if the claimant can "demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." See Sizemore v. Secretary of Health and Human Svcs., 865 F.2d 709, 711 (6th Cir.1988).  In order to "show good cause," the plaintiff must have a "valid reason for failing to obtain evidence prior to the hearing." See Willis v. Secretary of Health and Human Services, 727 F.2d 551, 554 (6th Cir.1984).

All new evidence submitted to the AC, with the exception of the records relating to the plaintiff's suicide, relates to the period on or before the date of the hearing before the ALJ.  See 20 C.F.R. § 404.970(b).   As this evidence supports the plaintiff's allegations, there is a reasonable probability, though certainly not definite, that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.  In addition, as noted above (see supra at 14-16), due to the brevity of the hearing, the ALJ's superficial line of questioning, the plaintiff's limited intelligence, and the fact that he was not represented by counsel, the ALJ failed to fulfill his responsibility in this case.  This failure of the ALJ to fully and fairly develop the record,

even though he was notified of other treating sources and records by the plaintiff, leads the Court to find that there was good cause for the plaintiff's failure to include the records.


## III.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion (Docket Entry No. 11) be DENIED to the extent that the plaintiff seeks reversal and GRANTED to the extent that the plaintiff seeks remand, and that the defendant's motion for judgment on the administrative record (Docket Entry No. 13) be DENIED.

Accordingly, the case should be REMANDED under Sentence 6 of 42 U.S.C. § 405(g) for the ALJ to further develop the record by receiving and considering any evidence that the plaintiff's representative may have with regard to any of the plaintiff's impairments and further review and/or provide good reasons to reject the opinion of Dr. Kinney.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of receipt of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).


_____
JULIET GRIFFIN
United States Magistrate Judge

25